Good morning, Your Honor. This is the court. My name is William Keon, representing the petitioner. This is a pre-Real ID Act asylum application, and the issue is credibility. The immigration judge assessed negative or adverse credibility and denied the asylum application, and the Board of Immigration Appeals affirmed it without opinion. So, therefore, the issue is the credibility issue. The immigration judge stated that she believed that the petitioner concocted a story that he had a common-law wife, and that wife born a son for him. And the judge said this is a concocted story. I would argue that the immigration judge used her own speculation, her own conjecture in coming to this conclusion, not based on the evidence in the record. Ms. King, may I ask you a focused question, or sort of focused at least? Assuming that a number of the grounds upon which the I.J. made her adverse credibility finding are not appropriate under our precedent, my concern has to do with an inconsistency or difficulty that would be appropriate, I think, under our precedent. And that has to do with the extraordinary difference between what Lee said at the dockside interview and what he said later in several rather important respects. One, he didn't indicate that he was married or had a common-law wife and a son. He said he'd left China because he couldn't find a job. He said he was coming to the United States in order to get a job. He said that no police or government agency in China was after him. And so what I'd like to hear from you is why those major differences do not go to the heart of his claim and don't support the I.J.'s adverse credibility determination. Yes, Your Honor. I will address that right away. The dockside question and answer, we call it Q&A, is very, very skeletal. It consists of questions and short questions, short answers, mainly of yes and no. I'm perfectly prepared for purposes of my question to make all sorts of allowances for that, plus the quite extraordinary way in which he managed to venture from China to here. He's got to have been pretty tired when he got off the boat. But that aside, those are really fairly major, fairly easy questions to answer. That's right, Your Honor. And they were answered without apparent difficulty. Yes, Your Honor. First of all, regarding the wife, the petitioner did not mention he had a wife because he did not have a legally married wife. His wife was prevented from registration, the marriage registration, because she was underage. And also the Q&A did not specifically ask whether he had a son. They just say whether you have a spouse or not. So the matter of the son was never brought up in the Q&A. And thirdly, the respondent said his reason to come to the United States was to seek a job because he had difficulty finding a job in China. The reason he had difficulty finding a job in China is because he was in hiding with his wife. The police wanted to arrest him to send him to three years re-education through labor camp because he could not afford to pay the 30,000 RMB fine for giving birth to the illegal child. And therefore he could not afford to pay the fine. Now the reason that therefore he has to come to the United States to leave China to find a job in order to help his wife to pay the fine. And also the reason that the petitioner did not mention about the police was asked... You say his wife to pay the fine? I know there's some conflict on this. But is the fine assessed against Mr. Li or against his soon-to-be wife? Your Honor, I believe the record shows very clearly the fine was against both of them because they were both violators of the birth control policy, he being the father and she being the mother. So that's the way it works there. That's right. Now the IJ called attention to the fact that the 30,000 RMB fine was grossly excessive compared to the earlier discussion about, I think it was 500 RMB or 200 RMB. Was there any evidence introduced, anything in the record that you can point to that shows something to corroborate the amount of the fine involved? Yes, Your Honor. The 500 RMB refers to his monthly earnings. So yearly he earns 6,000. So the 30,000 RMB calculates to about five years of his gross income. And the country condition report that was submitted into evidence says that, I will quote to the court, that fines for over-quoted children, that is out-of-plan children born, can be extremely high, equaling several years' wages for an average worker. That is on page 194. And again, addressing the court on the previous question about the police thing, the petitioner did say that he had fear of returning to China. Maybe he did not answer the immigration officer clearly that the police was after him. But he did say that he had fear of returning to China. He could not afford to pay the fine. And the immigration judge assumed that. In fact, the immigration judge concluded the fine that he referred to was the fine for illegally leaving China. But that's not supported by evidence in the record. It could be interpreted both ways, either a fine for illegally exiting China or the fine for illegally giving birth to a child in China. Well, if it can be interpreted both ways, then why isn't our obligation, as it were, to defer to the immigration judge's choice? Because, Your Honor, the immigration judge used strictly her own conjecture, her own speculation. She believed that the petitioner was referring the fine to the illegal exit from China. When the record shows very well that the testimony by the petitioner was, he was fined heavily, 30,000 RMB, for giving birth to an out-of-plan child. In an asylum application, I believe if there is any benefit of the doubt, it should go to the petitioner, to the asylum applicant. And this man is a very little-educated person from a fisherman's family in China. And he just got off the boat as the court recognized that he was in a very difficult situation mentally, physically. And the Q&A was not supposed to be an asylum prescreening. It's just for determining whether the ID of the person, whether he's admissible or not. And the asylum laws set up procedures for credible fear by the trained asylum officer later on and by the immigration judge and by the Board of Immigration Appeals to assess the asylum application, the credibility on that. Mr. Kang, as you know, we are bound by the record here. We don't see Mr. Lee before us. We can't observe his demeanor. The immigration judge does that. And under our law, as you know, we review for substantial evidence. And according to the Singh case, we're only supposed to reverse if the evidence compels a contrary conclusion. So what we need is any help you can provide to us in the record of something that will, in effect, require us to find a contrary conclusion. We're bound by the IJ's perspective on the demeanor of the witness and so on. How can you help us here? She's obviously made some findings that to some degree were her impression, based perhaps on facial expressions, body language, whatever, which we can't see. What can you provide for us that helps us overcome this evidentiary burden that you have? That's right, Your Honor. Did the IJ base her conclusion on anything having to do with the immigrant's demeanor? No, not in this case, Your Honor. It's not a reason given, was it? Just that the judge said the petitioner was nonresponsive in a lot of answerings during the process. Nonresponsive, but that's in the record. That's right. So we can read whether the question, the answer was responsive to the question. Yes. Well, I would like you to tell me what you think in the record compels the opposite conclusion. All right, Your Honor. Regarding solid evidence, in fact, there is evidence in the file, which was entered into evidence without objection from the government trial attorney. The respondent entered into evidence birth certificates of himself, page 132, and birth certificate of his alleged common-law wife, and that's page 140. And both those documents were actually authenticated by the American consul general in China. What does that have to do with his asylum application? I mean, he was born, obviously, and he's from China. That's right. The more important one is the common-law wife's birth certificate to show her age, because the third document that was submitted was the child's birth certificate, and that indicated the mother was 18 years old at the time of giving birth to the child, and the father was the petitioner's name. And the country condition report specifically reported that it is illegal for single women to give birth to a child in China. The respondent did not get married to his common-law wife, and this is on page 194 of the country condition report, page 194 of the administrative record. And also the same page says the minimum marriage age for women is 20 years old, and at the time of the petitioner's wife's giving birth to the child, she was 18, as clearly marked on the birth certificate. And also on the same page, it mentioned about heavy fines up to several years, which we discussed already. And also the petitioner was worried, claimed that the police wanted to detain him in a labor camp for up to three years. This is also reported in the country condition report on page 186 of the administrative record, that the police has authority without judicial review to detain anybody and send them to labor, reform labor camp for up to three years in China. So the petitioner's story, I believe, is well supported by the record in the case. Okay. Thank you, Mr. King. If you've answered the page 4 last question, which I think you have, your time has expired. Thank you. May it please the Court, Donald Kuvion for Respondent. I know this is my case, but I'm not sure I'm in the right courtroom. You are. You are. It's our case, too. I'm trying to figure out who is Judge Fernandez, Judge Graber, and Judge Ikuda. Are you here for the Lee case? No, I was just trying to be humorous, Your Honor. They gave me the wrong name. Well, I'll tell you what. You've got a serious case here. Yes. Okay. And you're kind of rowing up a creek without a paddle. And so perhaps you might want to explain to us why. All right. I won't. I'll proceed. I just never had an instance where I didn't have any judge that they told me I would have. Well, you've got three of us anyway. Yes. Thank you very much. Who told you, by the way? Pardon? Oh, it's all screwed up. Just don't worry about it. Okay. All right. Did you write this brief? I did. You did write this brief? Okay. The bottom line here is that of all the zillion reasons that the immigration judge gave for making an adverse credibility determination, almost all, if not all, are inadequate under existing Ninth Circuit precedent. Whether one likes the precedent or not, that's the reality. Most of the findings are out the window. So can you explain in 25 words or less why Mr. King is not correct that the record evidence does, in fact, compel the opposite conclusion in that what he said that might have made a difference at the dockside interview isn't sufficient? Well, I think that there are two reasons. One is in direct answer to Your Honor's question, and the other is that the petitioner here isn't even traditionally married to this woman. What does that have to do with the price of eggs? I mean, if he's – that makes – that's what creates his problem. Well, I mean – So you accept that is true? You accept it's true that – I mean, you're not contesting that he has – it's a girlfriend. I mean, you do make that comment in a rather derogatory fashion. No, I don't contest at all that he has a girlfriend, and that's all she is. But he's not even traditionally married. What does traditionally married mean? That's how you marry in China. Well, I understand, but that's what creates the problem, the fact that his girlfriend got pregnant and had a child when they weren't married. If they had been married, there wouldn't have been a problem. But the Ma case does not cover this situation. In Ma, the couple was traditionally married like every couple in China. Registration is not marriage. Registration – We're not talking about the China one child – you know, you're about ready to get taken to have bad things done to you situation. What we're talking about here is someone who claims persecution on account of the fact that his girlfriend had a baby – I'm aware of that, Your Honor. – when they were not married that subjected him and her, but him, to a humongous fine that he had no possible way of – He has no legal standing for his claim. Well – Under Ma. Why? Why? Yes. Because he's not married. Look, maybe you and I are on a different train here. His claim is that he is subject to persecution on account of the fact that he was not married, and that's what caused the Chinese authorities to impose a fine on him and his girlfriend that he couldn't pay. And because he couldn't pay it, he was going to be sent to a labor camp. Now, that may be true or it may be untrue, but that's his claim. His claim, until he got to the hearing, was that he was going to get in trouble, or he was wanted because he was considered a hooligan because he had impregnated an underage female – unmarried, underage female. That was his problem. It wasn't that he was the husband. And the case law in this circuit does not cover boyfriends. Does not cover what? Boyfriends. Okay. Or girlfriends. This Court has not gone that far. And once again, I cite the Ma case. I stand on that. Now, in regards to the credibility, it's interesting to note that, one, at hearing, he did not make any claim. When he, once again, changes the nature of his claim a little bit, he doesn't make any claim about disavowing what he said previously at dockside or, over two weeks later, with a trained asylum officer, with his attorney present, by phone. And it's very interesting that, even if the argument is true, without any supporting evidence, that he might have had some confusion or whatever at dockside, he says the same thing, almost, two weeks later. He can't decide whether or not the child was born before or after he left. He makes no claim to being married. It wasn't a ground that the I.J. gave, though, right? I'm sorry? We can't consider that since the I.J. did not rely on it to make her adverse credibility determination. There were a host of reasons that she proffered. We selected three that we thought were primary reasons. And what were the three? Well, one was the I.J.'s implausibility finding. She just did not believe, based upon everything she heard and saw, that he would have so brazenly taken his girlfriend home immediately after the birth at the hospital in light of the fact that he had hidden her up to that point. There's an easy answer for that, isn't there, counsel? I mean, before they were afraid of a forced abortion. Once the child has been born, they don't have to worry about that anymore. And the fact that they had to go to the hospital, the authorities obviously knew about it. Why does that constitute a substantial ground for a lack of credibility? Well, the I.J. just didn't find it persuasive. I understand that, but the I.J. has an obligation to list substantive pieces of evidence upon which her findings can be based. And at least on that one, I for one, I don't understand that one, because there is a clear difference before the baby's born and after the baby's born. First to admit that it can be seen in many ways. I understand, but the government has the burden initially here. Once we get up to the court of appeal, then Mr. Lee has some obligation to show why the I.J. did not have substantial ground. But the ground is crumbling out from under the government's case on this. I'm trying to understand where the government's case rests at this point. Then I was going, Your Honor, to the other two reasons that we thought were better than the rest, and that was the discrepancy between what was said before the hearing at both Dockside and the asylum interview and at hearing. And as we all know... There was a discrepancy, but tell me substantively, what are the really important differences? Every human being in different occasions is going to say things in a different way, particularly if they're under pressure, which Mr. Lee clearly was. What are the substantive differences between the Dockside interview and the I.J. hearing that you believe were substantial enough that the I.J. could have founded her opinion on those differences? All right, the first one is that not until the hearing did he claim, at least some of the time, that this woman was his wife. And he was asked, Why do you consider her your wife? And his answer was, Because my mother and father agree. That's what he said. Maybe under Chinese culture there's nothing wrong with that. But it's interesting that he never claimed... In fact, it may not be all that different here. Well, I think it's dangerous to engraft common law onto Chinese society. It could lead to more misunderstanding than not. But at any rate, he never made such a claim. He didn't even make it in the asylum application that was proffered months later. Well, he seemed to be... I mean, he didn't waver in his story. He was consistent that this was his girlfriend who he wanted to marry, wasn't allowed to marry. No, Your Honor. And yet he viewed her as his wife. In fact, the pictures he submitted in the record say he submits girlfriend with child and shows a picture of her and a picture of the baby. So he calls her girlfriend. But he nevertheless views her as they're bonded so much that they're like husband and wife. And they would be if they had been allowed to be married under Chinese law, which is part of their birth control program is to... Coercive population control cases and they say... Can I finish? According to the country report, which I... The country says that's part of their population control measures is deferring the age at which people can marry, particularly women, so that they don't have a chance to start having babies. Forcing a situation like this where, you know, they view themselves as married, but, you know, they can't under Chinese law. I can only say I've never seen a case, a population control case from China, where the couple, if they said they were married, didn't marry, traditionally in the village. I haven't seen a case yet that really fleshes it out and says what that means. But I've never heard one where they said, because mommy and daddy agree with me. And that's all you have here. He never claimed. He never uses the word. And we know, at least, I've never seen a case yet where registration was married. In some cases, registration is permission to marry if they go first. And in other cases, after the fact, when it's a recognition. Because you're living in a socialist country and benefits come or don't come from a marriage relationship. For the children, most especially. They can't go to school, perhaps, if they're not the issue of a married couple. But in regard to the... Mr. Lin, your time has expired. I think you answered the last question. May I just add one thing? Thank you very much. Your time has expired. Thank you.
judges: Rymer, Wardlaw, Smith